# KENNETH D. QUAT
*Attorney at Law*
9 Damonmill Square, Suite 4A-4
Concord MA 01742

Phone: 978-369-0848  ken@quatlaw.com
Fax: 978-371-2296

April 21, 2004

HAND-DELIVERED BY CONSTABLE

Zwicker & Associates, P.C.
800 Federal Street
Andover MA 01810

    RE: Melanie J. Feuerstein – Demand for Settlement Pursuant to G.L. c. 93A, Section 9.

Dear Sir/Madam:

    This office represents Melanie J. Feuerstein with respect to claims she has against you pursuant to section 9 of General Laws Chapter 93A, the Massachusetts Consumer Protection Act. This letter constitutes a demand for relief pursuant to said statute.

    Ms. Feuerstein is the borrower and William M. Schwank ("Schwank") is the co-signer on four (4) promissory notes representing loans made to plaintiff by the Massachusetts Educational Finance Authority ("MEFA"). Said loans were utilized by plaintiff to attend law school at Boston University. Your office has from time to time been engaged by MEFA to attempt to collect monies allegedly owed to MEFA under these notes.

    Beginning in or about December, 2002, your office engaged in a persistent and continuing course of conduct which was designed to harass, abuse, and intimidate Ms. Feuerstein and deprive her of her statutory and common-law rights, to wit:

    1) On or about December 23, 2002, Jason Fisher ("Fisher") – Feuerstein's "significant other" and a member of her household - checked his voice mail when he returned home at approximately 8:00 p.m. Fisher heard a voice mail directed at Feuerstein, stating: "Ms. Feuerstein, this is Jeff Woods, it is imperative that you call me today at 1-800-370-2251 extension "3713". The message did not state that it related to the attempted collection of a debt or that any information obtained would be used for that purpose. A few moments later Fisher's phone line rang and the anonymous call reject indicated that "Jeff" was calling; assuming the call was an emergency related to the voice mail, Feuerstein accepted the call.

Zwicker & Associates, P.C.
April 21, 2004
Page 2

2) A male caller identified himself as "Jeff Woods" and stated that he was an attorney and family friend of Schwank's. Woods falsely told Feuerstein that there had been a bad accident involving "Bill's" mother and that "Woods" immediately needed Bill's cellphone number. Feuerstein was suspicious as the "caller ID" function on the phone indicated "Zwicker & Associates" and a Massachusetts area code; furthermore, Woods said the accident occurred in Florida, while Feuerstein knew Bill's mother lived in Vermont.

3) Feuerstein informed Woods' of her suspicions, requested Woods' BBO number and informed Woods that if the information turned out to be inaccurate, she would file complaints with the Massachusetts Attorney General and Massachusetts Board of Bar Overseers. Woods told Feuerstein to "go ahead," and said she should represent herself "when we arrest you for the $50,000 you owe us." "Woods" then screamed obscenities at Feuerstein. Feuerstein told Woods the phone number he was calling on belonged to Jason Fisher, to cease communicating with her at that number and outside of a writing, and that all communications regarding her student loans should go to Schwank's Attorney in New York.

4) Woods told Feuerstein to "let him [sic] know when she felt like paying for her education," screamed more obscenities, told Feuerstein "we are going to put in the computer that you were not home and we'll call again tomorrow night," and hung up abruptly. Woods called back again several times that night and the following night, Christmas Eve. Each time the phone was answered by Fisher. During each of these calls Woods demanded Fisher pay Woods $50,000, called Fisher obscene names and then abruptly hung up.

5) From December 24, 2002-January, 2003, Woods and an individual identifying himself on occasion as "Brian Coyle," "Supervisor of Jeff Woods," and "an Attorney " or "Collections Manager" at Zwicker & Associates" called Feuerstein on Fisher's phone number on a nightly basis, often several times per night.

6) Each time Woods or Coyle reached Feuerstein or Fisher, Woods and Coyle screamed at them, threatened to have Feuerstein and Schwank arrested, and yelled obscenities. Each time Coyle and Woods called, Feuerstein told them to cease calling her and to direct all contacts to Schwank's attorney. Each time Woods or Coyle reached Fisher, Woods consistently identified himself as an attorney, stating that he was investigating a "business matter" involving $50,000 which Schwank and Feuerstein owed.

7) On February 11, 2003, your office sent Schwank four collection letters misrepresenting the status and amount owed on Plaintiff's loans. True copies of said letters are attached hereto as Exhibit A.

8) On or about February 12, 2003, despite Ms. Feuerstein's repeated demands that

Zwicker & Associates, P.C.
April 21, 2004
Page 3

contact with her cease and be directed to Schwank's attorney, Woods called Feuerstein's home and spoke with Fisher. Woods again identified himself as an attorney, this time claiming he was employed with Key Bank. Woods further stated to Fisher that he was looking for Feuerstein and Schwank because "they owe us $50,000 on a business matter," told Fisher that Schwank's employees were covering up for Schwank by claiming he was not at work, and asked Fisher for Schwank's cellphone number. When Fisher told Woods to cease calling his home, that Feuerstein was ill, and that he should not call any more, Woods stated, "You better pay us or we'll come arrest you both." Woods also stated " You owe us $50,000, you've never made any payments on your student loans, we'll take your house in Florida and send a Marshall to arrest you and [Feuerstein] if you don't pay." Woods also stated "we will enter that you were not home and call tomorrow night";

9) On or about February 13, 2003, Woods again called Feuerstein on Fisher's number, at Fisher's home, to demand payment, eventually screaming obscenities and hanging up, as usual. A few minutes later, a person identifying himself as "Brian" and an "attorney and collections manager at Zwicker & Associates " called Feuerstein on Fisher's number. "Brian" stated to Fisher that he was Woods' supervisor, claimed that no payments had ever been made on Feuerstein's student loans since 2000, and that he didn't have to contact any attorneys for Feuerstein or Schwank or provide any proof of the debt to Ms. Feuerstein "Brian" also stated, falsely, that he had just spoken to Schwank and that Schwank had said Feuerstein was faking illness. "Brian" further stated that Feuerstein owed $42,000 and that he was sending a Marshall to arrest Schwank at his employer's office if Feuerstein did not pay.

10) On or about February 19, 2003, "Brian" called again and again identified himself as "Attorney Woods' manager." "Brian" stated that he had just talked to Schwank and that Schwank said Feuerstein is not ill. "Brian" told Fisher there was nothing wrong with Feuerstein, that "Your girlfriend is a [expletive] liar" and threatened to sue Feuerstein and get a default judgment. He also said "we are charging you $6,000 to keep this up; we'll do what we want." He also stated he would not send Feuerstein any records as she had requested, used a stream of expletives, and hung up.

11) A few days later Feuerstein's household received a call from the "anonymous" call reject system notifying them a person was calling identifying himself as "Jeff" who is a "friend of Bill's [Schwank]." "Jeff" asked for Schwank's cellphone number and the name of a hotel where he might be staying. "Jeff" told Feuerstein that if she didn't give the information to him he would attach Schwank's paycheck and arrest him. When Feuerstein asked him if he would bother seeking judicial process first, "Jeff" screamed obscenities, informed Feuerstein he would call again the next night, and hung up.

12) On February 26, 2003, your office sent Feuerstein four collection letters purportedly signed by Arthur J. Tessimond, each falsely dated February 22, 2003, to an address where you knew Feuerstein no longer resided, each misrepresenting the status and amount of Feuerstein's student loans, and each bearing no indication of any accounting or

Zwicker & Associates, P.C.
April 21, 2004
Page 4

basis for how the alleged amounts were calculated. True copies of said letters and envelope are attached hereto as Exhibit B.

13) On information and belief, the aforementioned letters are computer generated form letters containing canned paragraphs routinely utilized by your office. Neither the letters nor Feuerstein's file was actually reviewed by Tessimond prior to same being mailed to Feuerstein. If Tessimond had actually reviewed the letters and Feuerstein's file, blatant errors would have been discovered and presumably corrected.

14) On March 13, 2003, "Woods" again called Feuerstein at Fisher's residence, where Fisher answered the phone. "Woods" told Fisher he was a "friend" of Feuerstein's, then screamed obscenities and hung up. "Brian" called back. Fisher told him again to stop calling and harassing them, as Feuerstein was recuperating from surgery. When Fisher said they would be filing a complaint with the BBO, "Brian" said he didn't care, that "you" owe $45,000, that they were being charged $3,000 for calling and harassing them, and that he would have Feuerstein's law license revoked. "Brian" then screamed obscenities and hung up.

15) On March 20, 2003, and again in spite of being told to refer all contact regarding Feuerstein's loans to Schwank's attorney, "Woods" again contacted Schwank at his place of employment purporting to be an unsatisfied customer of Schwank's employer. "Woods" spoke to Schwank's employees, accusing them of covering up for Schwank, and talking to them in a shrill and vulgar manner. When Woods reached Schwank, Schwank informed Woods that all contacts should go to his attorney and that if he contacted him again Schwank would file criminal charges against Woods for criminal harassment. Woods screamed expletives at Schwank and hung up.

16) On March 25, 2003, Schwank's attorney - Michael J. DeZorett - contacted "Woods" by phone. "Woods" falsely stated Woods was an attorney and refused to speak with DeZorett. Dezorett immediately contacted "Woods" in writing, demanding that Woods cease contacting Schwank at his work or directly and that Woods provide any and all relevant documents concerning the MEFA accounts. DeZorett further stated that he would discuss and attempt to resolve the matter upon receipt of these documents. (A true copy of DeZorett's letter is attached hereto as Exhibit C.) Your only response to this letter consisted only of a 15-page fax containing incomprehensible, unidentifiable, and incomplete portions of the Key/MEFA Notes themselves, with no information about Feuerstein's or Schwank's account history or payment records. (A true copy of said fax is attached hereto as Exhibit D).

17) The next day, again in spite of the repeated demands that your office direct all contacts to Schwank's attorney, your office again sent Feuerstein four "form" collection letters to her old address misrepresenting the status and amounts of her loans. (True copies of said letters and envelopes are attached hereto as Exhibit E.) Woods also began

Zwicker & Associates, P.C.
April 21, 2004
Page 5

repeatedly phoning DeZorett's office demanding a $50,000 payment and demanding to speak with DeZorett. Woods used obscene and vulgar language with Dezorett's assistant, accused her of lying to him about DeZorett;s whereabouts, and demanded DeZorett's cellphone number. On one of these occasions, Woods called DeZorett names and told DeZorett's assistant that if she did not give him DeZorett's cellphone number, Woods would contact Schwank directly at work and have him arrested. In tears, DeZorett's assistant disclosed the cellphone number. Woods then repeatedly called DeZorett's cellphone while DeZorett was in a closing and yelled obscenities at him so loudly that other persons in the room could hear.

18) DeZorett excused himself from the proceeding. DeZorett told Woods that if he continued his outrageous conduct he would report him to the New York Bar disciplinary authorities. DeZorett also asked if he could speak with Attorney Zwicker or another lawyer in his office. Woods refused, called DeZorett names, and stated "I've read all our notes concerning the loans; your [expletive] Client owes us $50,000," and hung up.

19) Despite the frequent oral and written repeated requests made by Feuerstein, Schwank, and DeZorett for an accounting of the four loans and alleged amounts due under the Notes, your office has ever provided same.

20) Despite the frequent oral and written requests made by Feuerstein, Schwank and DeZorett that all contacts be directed to DeZorett, for the next several months your office made numerous calls to Feuerstein at Fisher's number and at Fisher's residence, and directly to Schwank at his home. These calls would routinely be made from several different numbers (including on Saturdays and Sundays) and let the phone ring until the voice mail picked up, but they left no messages.

21) In early July, 2003, Feuerstein was pregnant and not feeling well. A female employee of yours called Fisher's number from an unidentified number and left a message under an assumed name, telling Fisher to call back, saying it was an "emergency" concerning Feuerstein. Fearing that Feuerstein was injured, Fisher returned the call. When the employee refused to identify herself and asked Fisher questions about Feuerstein and Fisher's relationship, Fisher told the employee that Feuerstein was pregnant and feeling ill and had been advised to avoid stress. He also informed the employee that he knew who they were and demanded they not call anymore. Your office nonetheless continued calling on a nightly basis. On several of these occasions the caller said your office was sending a Marshall out to arrest Fisher and Feuerstein.

22) On July 14, 2003, Feuerstein began bleeding; she suffered a miscarriage and had surgery. When your office next called, the caller began asking Fisher personal questions about his relationship with Feuerstein Fisher informed them of the miscarriage and surgical recuperation and asked if they were happy about the results of their harassment. He also demanded that your office cease contacting his number and informed

Zwicker & Associates, P.C.
April 21, 2004
Page 6

them he intended to file a police report with the Franklin Police Department for the annoying phone calls and for criminal harassment. Fisher also stated that he would retain his own attorney and obtain an injunction if they continued to contact Feuerstein, Fisher or Fisher's number. Coyle claimed he "just spoke to Bill, that Bill said Feuerstein was not ill," and that he would call again tomorrow. Coyle told Jason he had no business being anyone's father. He also asked Fisher questions directed to finding out whether someone in Feuerstein's or Fisher's family might pay $50,000 to satisfy the loans. He further told Fisher he better get a loan and pay them $50,000 or they would have Feuerstein's law license revoked, have her arrested, and take Fisher and Feuerstein's house. Fisher informed Coyle he was calling the Franklin Police on his other line and Coyle then screamed obscenities at Fisher before finally hanging up.

23) Several days later, your office sent Feuerstein 8 additional "canned" collection letters, falsely dated July 16, 2003, two for each of the student loans, each letter falsely representing the status and amounts due on the loans, and each addressed to Feuerstein's old address which your office had repeatedly been informed was no longer Feuerstein's residence. (True copies of said letters and envelopes are attached hereto as Exhibit F)

24) On or about October 23, 2003, Tessimond and your office filed a specious lawsuit on behalf of MEFA against Feuerstein in Middlesex Superior Court falsely alleging that Feuerstein was delinquent on her MEFA loans and had defaulted on the 4 promissory notes. The complaint stated Feuerstein's address as Marlborough, Massachusetts even though you knew same to be false.

25) Your office intentionally filed said lawsuit in Middlesex County despite having actual knowledge or reason to know that venue in said county was improper. You intentionally also had the summons (and no complaint) for said lawsuit served at an address which you knew or had reason to know was not Feuerstein's residence. You took such action for the specific purpose of depriving Feuerstein of actual notice of the lawsuit so she would not answer or otherwise respond to the complaint and a default judgment could be obtained against her.

26) On or about November 4, 2003, Feuerstein received a voice mail left at Fisher's number from an unidentified individual stating it was an imperative "Attorney Feuerstein" return the call immediately. A few minutes later, at 8:40 p.m., Feuerstein received a call on Fisher's number from a "Barry Smith" of Zwicker and Associates. "Barry" falsely represented he was an attorney with Zwicker and Key Bank, that no payments had been made on the MEFA loans since December 2000, and that Feuerstein owed Zwicker $48,000. When Feuerstein informed him that your office had consistently refused to provide records of her account, "Barry" said that the only record she would be getting is a summons, which he claimed had already been served on her. Feuerstein told him she hadn't received anything, and that your office had her current address so that if it went to

6

Zwicker & Associates, P.C.
April 21, 2004
Page 7

her old address, that would not be effective service. She requested "Barry's" BBO number, at which point "Barry" abruptly hung up.

27) On December 11, 2003, the lawsuit was dismissed by the Middlesex Superior Court for improper venue. Your office did not oppose Ms. Feuerstein's motion to dismiss. Moreover, your office did not oppose Ms. Feuerstein's subsequent motion for reconsideration seeking double costs, which motion was allowed by the Court.

28) On or about March 1, 2004 – while Ms. Feuerstein's motion for reconsideration was pending - your office sent an additional 4 "form" collection letters to this office, one for each of the four student loans. Each letter contained the same "canned" paragraphs as the previous letters, and each falsely represented the status and amounts due on each of the loans. (True copies of said letters are appended hereto as Exhibit G.)

29) Throughout the above time period, and continuing through the present, payments were made in good faith on each of Feuerstein's student loans. However, despite said payments, your office continued to claim, orally and in writing, that no payment was ever made on the loans and that they were delinquent and in default, and continued to willfully and knowingly employ unfair, deceptive, and otherwise unlawful conduct designed to coerce money from Ms. Feuerstein and deprive her of her legal rights.

30) On multiple occasions from the end of December 2002 to date, Feuerstein and Schwank informed your office that they contested the validity of the claims that the loans were delinquent or in default, and requested that you provide documentation – such as a payment record or account history – to support their claims so that any problems could be addressed and, if necessary, corrected. Your office consistently refused and never provided any of the requested documentation. In addition, you continued to contact Ms. Feuerstein and third parties, and to discuss the alleged debts with third parties without Ms. Feuerstein's consent, even though you had been instructed on repeated occasions to cease all such contacts.

31) On information and belief, you refused and failed to provide any of the requested documentation so you could "pad" legal fees by continuing to pursue collection activity and litigation against Feuerstein. Such "padding" included, but was not limited to, filing the improper lawsuit described above.

The actions detailed above constituted unfair and deceptive acts and practices in violation of G.L. c. 93A. Specifically, they violated G.L. c. 93, section 49, by communicating in such a way as to harass and embarrass Ms. Feuerstein, including communicating at unreasonable hours, with unreasonable frequency, by threatening her with arrest, and by using offensive language. Said statute was further violated by the failure to provide Ms. Feuerstein with information regarding the status of the alleged debt, and by filing suit against her in an improper county and with improper service of process in

7

Zwicker & Associates, P.C.
April 21, 2004
Page 8

order to unlawfully obtain a default judgment. The statute provides that any violation thereof "shall constitute an unfair or deceptive act or practice under the provisions of chapter nine-three A." Moreover, the above actions also violated the following debt collection regulations of the Commonwealth of Massachusetts: (a) 940 CMR 7.04, by threatening Ms. Feuerstein with arrest, using obscene and profane language, and by exceeding two calls in seven days to the plaintiff's residence; (b) 940 CMR 7.05 by implying the fact of a debt to persons residing in Ms. Feuerstein's household, by using obscene and profane language to persons residing in her household, and by contacting persons residing in her household with unreasonable frequency; (c) 940 CMR 7.07, by misrepresenting the character, extent, or amount of the debt, by misrepresenting that the caller was an attorney, and by misrepresenting that the debt could be increased by attorney's fees and collection costs. Pursuant to G.L. c. 93A, section 2(c), each violation of such regulations is also considered an unfair or deceptive practice.

Pursuant to 940 C.M.R. 3.16, an act or practice is considered unfair and deceptive if it violates a federal consumer protection statute within the purview of G.L. c. 93A, section 2. One such statute is the federal Fair Debt Collection Act, 15 U.S.C. 1692 *et seq.* Your actions have violated the following sections of the Act, and consequently section 2 of chapter 93A:

(a) 15 U.S.C. §1692(d), by engaging in conduct the natural consequence of which was to harass, oppress, embarrass, demean or abuse various persons in connection with the collection of the Notes. Specifically, you employed illegal means, including but not limited to: the threat of arrest, the use of obscene and profane language, and making repeated telephone calls at inconvenient hours;
(b) 15 U.S.C. §1692e(4) and (5) by threatening to arrest Feuerstein even though such action would not have been lawful and you did not intend to take such action;
(c) 15 U.S.C. §1692e by falsely representing that Woods was an attorney and licensed to practice law in the Commonwealth of Massachusetts;
(d) 15 U.S.C. §1692c(b) by communicating with third parties regarding the alleged debt without prior consent of Feuerstein given directly to you or as otherwise permitted by law;
(e) 15 U.S.C. §1692e(2)(B) and § 1692f(1) by falsely representing the compensation which may be lawfully received by you for the collection of the debt, and attempting to collect same from Feuerstein;
(f) 15 U.S.C. §1692e(2) by falsely representing the character, amount, or legal status of the debts;
(g) 15 U.S.C. §1692f by failing and refusing to provide Feuerstein with information she requested to determine the status of the debt and accounts with MEFA, including but not limited to accounting and payment records.
(h) 15 U.S.C. §1692e(3) and (10) by forwarding correspondence to Feuerstein which suggested it was from an attorney when, upon information and belief, no

Zwicker & Associates, P.C.
April 21, 2004
Page 9

   attorney actually reviewed Feuerstein's file or records related to any of the four loans, or the correspondence itself, prior to sending the correspondence.

(i) 15 U.S.C. §1692i(a)(2) by bringing legal action against Feuerstein in an improper judicial district.

(j) 15 U.S.C. §1692f by bringing legal action against Feuerstein in an inconvenient judicial district and by serving a summons upon her at an address which defendants knew, or should have known, was not Feuerstein's residence and had not been Feuerstein's residence for some time.

(k) 15 U.S.C. §1692f by continuing to contact Feuerstein, the co-signer and third parties after you had repeatedly been informed that Feuerstein and co-signer were represented by counsel and that any and all contact regarding the loans were to go through counsel;

(l) 15 U.S.C. §1692g by failing to send Feuerstein a written notice containing the information required by said statute within five days after the initial oral communication, which occurred in December 2002;

(m) 15 U.S.C. §1692e(11) by failing to indicate in the initial oral communication with Feuerstein that you were attempting to collect a debt and that any information obtained would be obtained for that purpose.

  As direct and proximate results of the conduct set forth above, Feuerstein suffered a deprivation of statutory and common-law rights, unreasonable and substantial invasion of her privacy, and severe emotional distress and mental anguish. She lost sleep, suffered severe headaches, missed time from work, endured considerable stress and anxiety; and spent countless hours dealing with the unlawful and abusive conduct carried out by your employees and agents. She was also compelled to retain counsel, resulting in costs to date of $1,262.50 and additional inconvenience and distress.

  In view of the harm suffered by Ms. Feuerstein due to your unlawful conduct, as set forth above, Ms. Feuerstein's demand for relief pursuant to section 9 of chapter 93A is payment of $100,000 (one hundred thousand dollars). Pursuant to statute, you have thirty (30) days from receipt of this letter to tender a reasonable written offer of settlement.

  Should you fail to tender a reasonable written offer of settlement in a timely fashion and Ms. Feuerstein establishes in court that your conduct violated G.L. c. 93A, section 2, she will be entitled to recover her actual damages or $25.00, whichever is greater, plus her costs and reasonable attorney's fees. Should Ms. Feuerstein further succeed in establishing that your conduct was willful or knowing in nature, or that your failure to tender a reasonable offer of settlement was in bad faith with knowledge or reason to know that your conduct violated said section 2, then she will be awarded not less than two nor more than three times her actual damages, or $25.00, whichever is greater, plus her costs and reasonable attorney's fees.

Zwicker & Associates, P.C.
April 21, 2004
Page 10

      I look forward to hearing from you or your attorney within thirty (30) days.

                                          Very sincerely,

                                          Kenneth D. Quat

Cc: M. Feuerstein